**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OFARIZONA

| | |
|---|---|
| Monica Steinke, | CV-07-1953-PHX-JAT |
| Plaintiff, | |
| v. | **ORDER** |
| Metopolitan Life Insurance Company, Bank of America Group Benefits Program, | |
| Defendants. | |

Based upon the parties' stipulation, the trial of this matter was deemed submitted on the briefs. Defendant Metropolitan Life Insurance Company ("MetLife") denied long-term disability benefits to Plaintiff Monica Steinke under the Bank of America Group Benefits Program ("the Plan"). For the reasons that follow, the Court finds that Steinke is not entitled to long-term disability benefits.

**I.    Findings of Fact**

Steinke started working with Security Pacific Bank as an operations officer in 1989. When Bank of America took over Security Pacific, Steinke remained with the company. Before stopping work due to her disability, Steinke's position with Bank of America was Vice President – Regional Quality Optimization Manager.

Steinke asserts that she has a long-standing history of migraine headaches, starting from the time she was nine years old. Steinke began treating with board-certified neurologist Stuart Hetrick, M.D., in February 2002 when she was suffering from migraines on a daily

1  basis. Dr. Hetrick described the change in Steinke's headaches in 2002 as having increased
2  in frequency, with quick onset, visual symptoms, and "very classic migraine in character and
3  disabling." From 2002 to December 2003, Dr. Hetrick tried preventative medications,
4  including Zonegran and Topomax.

5  Steinke saw Dr. Hetrick on December 2, 2003, for an urgent appointment due to the
6  severity of her headaches interfering with her ability to work. Dr. Hetrick started to taper
7  Steinke off of Topomax, and placed her on leave from work for three months.

8  Steinke followed up two weeks later on December 19, 2003. She reported that her
9  headaches had worsened without the use of Topomax. In addition, Steing reported that her
10 headaches were more frequent and more severe. Dr. Hetrick made several medication
11 changes. Dr. Hetrick also recommended treatment with psychologist Dr. Roth-Roemer for
12 stress management. From December 19, 2003, to January 5, 2004, Steinke reported only
13 three headache-free days, stating that her headaches ranged from moderate to severe.

14 As of January 26, 2004, Steinke's headaches were shorter in duration and less severe.
15 Steinke and Dr. Hetrick discussed her returning to work. Dr. Hetrick started a two-week
16 taper of medications, with the intention of Steinke returning to light duty (20 hours per week)
17 by March 1, 2004.

18 On February 24, 2004, Steinke reported that her headaches were mild to moderate
19 severity 20 of 30 days. Dr. Hetrick placed Steinke on Depakote for migraine prevention. Dr.
20 Hetrick noted that Steinke was continuing to see Dr. Roth-Roemer for stress management,
21 and anticipated that Steinke would be able to increase her workday to six hours after one
22 month. During this time, Steinke had returned to part-time work.

23 On March 25, 2004, Steinke presented at Dr. Hetrick's office, and reported having
24 headaches five days per week that were moderate to severe and lasted two hours in duration.
25 Two weeks later, Steinke reported increased severity of her headaches. Steinke continued
26 to have problems functioning at work.

27 On April 7, 2004, Dr. Hetrick placed Steinke on medical leave for at least a year. He
28

concluded that "due to her severe and disabling migraine headaches she is unable to carry out any meaningful employment." Dr. Hetrick changed her medication by having her taper off the Depakote and return to Topomax.

On May 3, 2004, Steinke reported that her return to Topomax significantly reduced her headaches. Dr. Hetrick saw Steinke on June 14, 2004. Steinke reported some continued improvement from Topomax, but not at the same level of headache control she had previously experienced with the use of the medication. At her August 3, 2004 office visit, Dr. Hetrick increased Steinke's amount of Topomax. At her October 5, 2004 visit to Dr. Hetrick, Steinke reported significant improvement in her headache frequency after increasing her dose of Topomax. Steinke saw Dr. Hetrick's physician assistant, Amber Walsh, on December 7, 2004. Walsh noted eleven headaches in October and November of 2004.

On February 7, 2005, Dr. Hetrick reevaluated Steinke. Steinke reported having eight to ten headaches per month. Dr. Hetrick made no medication adjustments. Steinke reported that her headache pattern had not changed by her March 10, 2005 visit with Walsh. Walsh noting the side effects of Topomax, ordered a taper off of Topomax, replacing it with Keppra.

On March 31, 2005, Steinke returned to see Walsh. Steinke reported continued experience with frequent headaches. Walsh made several medication changes in response to Steinke's reported headaches.

At an April 21, 2005 visit, Walsh noted that after tapering off Topomax, Steinke's reported headaches were again increasing in frequency, so she ordered a restart of Topomax. After returning to Topomax, Steinke reported to Walsh on June 29, 2005, that her headaches had significantly improved. She was requiring less medication and going several days without a headache. On August 4, 2005, Steinke continued to report improvement, after having restarted Topomax.

Steinke's migraine diary between December 2003 and June 2005 shows that, on average, Steinke suffered 18.5 migraines per month. On October 27, 2005, Steinke treated

with neurologist Dr. Mildred DeJesus. Steinke reported experiencing one to two headaches per week, accompanied by nausea and vomiting. Dr. DeJesus noted that Topomax was assisting in controlling the frequency of headaches but was causing side effects.

On November 29, 2005, Steinke reported having experienced twenty-one headaches since October 27, 2005. Dr. DeJesus added Lyrica to Steinke's prophylactic regimen. Steinke reported five headaches between November 29, 2005 and December 23, 2005. Because Lyrica was providing Steinke with some relief, Dr. DeJesus tapered Steinke off the Topomax.

Between December 29, 2005 and February 16, 2006, Steinke had one severe headache that caused her to need injectable medication at her physician's office. Steinke was still complaining of memory problems and a tingling sensation on her face. Between March 30, 2006 and April 19, 2006, Steinke reported a headache frequency of two or three migraines per month. Steinke also reported that her facial pain was becoming more problematic. On May 12, 2006, Steinke reported that her headache frequency was improved, but her complaints of facial pain were increasing.

Steinke described her facial pain as a disturbing numbness in her mouth, which was worsening by June 2006. Steinke reported experiencing four migraines between May 12, 2006 and June 2, 2006. On July 30, 2006, Steinke reported that the sensation around her mouth was improving. Dr. DeJesus believed that Steinke's facial pain was likely a side effect of Topomax.

Steinke sought a second opinion from Dr. Eric Eross on August 14, 2006. Dr. Eross noted that Steinke's reported headaches fulfilled the International Headache Society criteria for episodic migraine and chronic migrainous headaches. Steinke returned to Dr. DeJesus on August 30, 2006. Steinke noted that her headaches were more frequent, and stated that the medication changes Dr. Eross had made were not as effective as her previous medication regiment. Dr. DeJesus returned Steinke to her previous medication.

By her September 27, 2006 office visit with Dr. DeJesus, Steinke believed her

cognitive problems had improved enough since discontinuing the Topomax to consider returning to work. At her October 9, 2006 visit with Dr. Eross, Steinke reported an eighty percent improvement in her "headache course." Steinke met with Dr. Eross on November 6, 2006. Dr. Eross noted that the combination of Lyrica and Pamelor were achieving a dramatic reduction in Steinke's headache frequency, but that Steinke was continuing to experience parasthesias around the mouth. Steinke's improvement was also noted by Dr. DeJesus on a November 9, 2006 visit.

On January 10, 2007, Dr. Eross noted that Foothilss Neurology had changed Steinke's medication by discontinuing Lyrica and placing her on Tegretol. Dr. Eross was unhappy that Dr. DeJesus changed Steinke's medication and noted that "the patient's frequency and severity of headaches have increased dramatically." Dr. Eross informed Steinke that she had to choose between Foothills Neurology and his clinic. Dr. Eross further noted that "today we also had a frank discussion about her getting back to work and I have told her that is, in my opinion, it is critical that she begin to reintegrate herself into her work environment. This can be done on a modified or slowed schedule but I think with the proper support she will have success."

Steinke returned to Dr. DeJesus on January 9, 2007. She reported a sharp increase in her headaches after discontinuing Lyrica, and Dr. DeJesus restarted Lyrica and increased Steinke's Carbatrol dosage. Steinke followed up with Dr. DeJesus on February 6, 2007, reporting improvement in her headaches.

As of October 10, 2007, Steinke's medication regimen included: Nortriptyline (Pamelor), Prozac, Lyrica, Carbatrol, Frova, Clonazepam (Klonopin) and she was starting Tripleptal to replace the Carbitrol.

On August 4, 2004, Dr. Hetrick completed an Attending Physician's Statement for MetLife indicating that Steinke suffered from chronic migraine and severe daily headaches. Dr. Hetrick assessed Steinke's psychological function as allowing for limited stress and limited interpersonal relations. Dr. Hetrick stated that Steinke was unable to perform job

- 5 -

duties because "frequent severe headaches interfere with ability to perform normal work duties. MetLife approved Steinke's disability claim on October 5, 2004.

MetLife terminated Steinke's LTD benefits effective February 28, 2005 in a letter dated March 2, 2005. The denial relied on a January 20, 2005 review by Kevin Smith, D.O., who is board certified in Preventive and Occupational Medicine. Smith's review found that Steinke was not disabled because she had improvement in her headaches since May 2004. He dismissed Dr. Hetrick's reports of cognitive impairment because it was not detailed concerning her activities of daily living and no medication changes were made.

Steinke appealed MetLife's denial on August 24, 2005. MetLife referred Steinke's claim to Reed Review Services on September 8, 2005. MetLife asked for an opinion concerning whether the medical records supported functional limitations, whether Topomax would cause cognitive side effects and whether Steinke had received all treatments for chronic migraines. Reed Review had neurologist Joseph Jares, M.D., review Steinke's claim. He concluded that Steinke was not disabled. MetLife upheld its March 1, 2005 decision to deny Steinke benefits.

Steinke then filed suit against MetLife for failure to pay benefits. *See* CV 2006-0035-PHX-SRB. On March 13, 2007, the parties reached a settlement compromising the benefits due under the own occupation period of benefits. The parties dismissed the 2006 action that resolved the own occupation period benefits. The parties agreed that MetLife would then make a decision on whether Steinke was disabled from any occupation.

On May 23, 2007, Steinke forwarded additional medical records and a request that MetLife engage in rehabilitation services to see if she could attempt to return to work. Steinke experienced some steady improvement and her physicians felt she may be able to return to work.

In an August 24, 2007 note, Dr. Hetrick noted that Steinke's headaches had decreased in frequency and that she was getting relief from her medication. Steinke reported that she was more motivated to do things now, but that she could be tired by the end of the day.

Finally, Dr. Hetrick reported Steinke's ongoing complaints of numbness/tingling around her mouth.

At her October 10, 2007 office visit with Dr. Hetrick, Steinke reported experiencing eleven headaches during the month of September, as well as the continued numbness and tingling around her mouth.

MetLife took no action on the claim until November 7, 2007, at which point MetLife reviewed the previous medical review performed by Dr. Jares in September 2005, as well as the supplemental medical records provided. On November 8, 2007, Jenna Rauch, a Psychiatric Clinical Specialist for MetLife, was asked to review Steinke's claim for a psychiatric disability.

On December 7, 2007, MetLife determined that two independent physician consulatations were needed. MetLife had received reports from the two physicians conducting the review, but since Steinke had forwarded two additional office visit notes, MetLife sent them out to the physicians for review.

On February 7, 2008, MetLife advised Steinke that it had reviewed Steinke's medical records and determined that she continued to be disabled through October 9, 2006. Steinke received $8,759.10 in disability benefits covering the period from May 31, 2006 to October 9, 2006. MetLife indicated that it needed more time for an employability assessment to decide Steinke's eligibility for benefits beyond October 2006.

In February 2008, MetLife hired CorVel Corporation to perform a vocational evaluation on Steinke. CorVel utilized Steinke's education and work history to determine her transferrable job skills. CorVel then identified occupations that were available in Phoenix that Steinke could perform based on her transferrable skills and within her functional limitation of sedentary to light work. Finally, CorVel provided the median hourly wage and percentage of growth for each occupation. Ultimately, CorVel identified four suitable occupations for Steinke. CorVel then used America's Job Exchange and Career Builder to determine actual availability and salary in Phoenix. According to CorVel's report,

1  "comparable occupations to those listed above were identified as either currently hiring or had recently hired. Salaries, if they were reported, were in the range of $75,000 to $150,000 per year," the upper end of which exceeds Steinke's pre-disability salary of $90,000.

On March 17, 2008, MetLife claims specialist, Sheila Si, advised Steinke that her disability benefits were payable through October 10, 2006 to January 10, 2007, at which point MetLife determined that she no longer satisfied the terms of the Plan. In this denial letter, MetLife indicated that Steinke's appeal was reviewed by an independent physician consultant that is board certified in preventive medicine and occupational medicine. The physician who reviewed Steinke's file was Kevin Smith, D.O. Dr. Smith concluded that Steinke was disabled from a combination of headaches and cognitive side effects from May 31, 2006 to October 9, 2006. He found that she was not disabled from October 10, 2006 to December 10, 2006. He then concluded that she was disabled due to a series of headaches from December 10, 2006 to January 10, 2007, but she was no longer disabled after January 10, 2007.

**II.     Conclusions of Law**

**A.     The Plan**

Bank of America funded its disability benefits through a MetLife policy. To be eligible for monthly disability benefits, the participant must satisfy the Plan's definition of disability. For the first two years, the definition of disability is an own occupation definition. Thereafter, the definition of disability is an any occupation definition.

> "Disability" or "Disabled" means that, due to an injury or Sickness, you require the Appropriate Care and Treatment of a Doctor unless, in the opinion of a Doctor, future or continued treatment would be of no benefit and:
>
> 1.   you are unable to perform each of the material dutuies of your own occupation; and
>
> 2.   after the first 24 months of benefit payments, you must also be unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified taking into consideration your training, education, experience and past earnings . . . .

(Doc. # 45-9 at p. 12.)

The Plan grants discretion to the Plan administrator and other Plan fiduciaries, including MetLife as the claims administrator:

> In carrying out their respective responsibilities under the Plan, the Plan administrator and other Plan fiduciaries shall have discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.

(Doc. # 45-9 at p. 26.)

**B.  Exhaustion**

Steinke is seeking an award of benefits under the Employee Retirement Security Act ("ERISA"), 29 U.S.C. § 1132(a)(1)(B). Defendant argues that Steinke failed to exhaust her administrative remedies, as she did not appeal MetLife's March 17, 2008 decision. The Court disagrees that such an appeal was necessary.

Under ERISA, Congress provided that a "civil action may be brought . . . by a participant or beneficiary . . . to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan . . . ." 29 U.S.C. § 1132(a)(1)(B). "Before invoking this private right of action, however, an ERISA plaintiff whose claim is governed by the contractual terms of the benefits plan, rather than by the statutory provisions of ERISA itself, must first exhaust the administrative dispute-resolution mechanisms of the benefit plan's claims procedure." *Chappel v. Lab. Corp. of America*, 232 F.3d 719, 724 (9th Cir. 2000).

Chapter 29 of the Code of Federal Regulations, Section 2560.503-1, "sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries . . . ." Under the ERISA regulations, the insurer has 45 days to render a decision, with an option to seek two 30-day extensions of time. 29 C.F.R. § 2560-1(f)(3). On May 23, 2007, Steinke requested MetLife to make an any occupation determination. Steinke filed the present action on October 11, 2007. MetLife took no action on Steinke's claim until November 7, 2007, and did not render its decision

until March 17, 2008. It is undisputed that MetLife's decision fell well outside the 45-day time frame.[1]

If an insurer fails to render a decision within the above time frame, the regulations deem the claim for benefits exhausted:

> Failure to establish and follow reasonable claims procedures. In the case of the failure of a plan to establish or follow claims procedures consistent with the requirements of this section, a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a) of the Act on the basis that the plan has failed to provide a reasonable claims procedure that would yield a decision on the merits of the claim.

29 C.F.R. § 2560.503-1(*l*). Defendants do not provide any authority to support a contrary finding. Because MetLife failed to render a decision within the above time frame, and because the regulations clearly dictate that in such a situation Steinke's administrative remedies have been exhausted, Steinke's current lawsuit is not barred.

## C. Standard of Review

Steinke argues that because MetLife failed to adhere to the ERISA regulations governing the time for rendering a decision, this Court must review Steinke's claim de novo. Defendants argue that the failure to render a timely decision is a mere procedural irregularity, which does not alter the standard of review. Rather, Defendant argues, this procedural irregularity should be treated as a factor, like a conflict of interest, that is to be weighed in deciding whether the Plan administrator abused his discretion. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 972 (9th Cir. 2006).

The Court agrees that the failure to render a timely decision under the ERISA regulations does not, in and of itself, alter the standard of review. However, the Court is faced with a unique procedural posture; namely, the filing of the present lawsuit after the time frame expired for MetLife to render its decision, and then MetLife nevertheless issuing

---

[1] Even assuming MetLife properly sought two 30-day extensions–an assumption not supported by the record–MetLife's decision still fell well outside what would then be a 105 day time frame.

a decision, albeit subsequent to the filing of the present action.

In *Neathery v. Chevron Texaco Corp. Group Accident Policy*, 303 Fed.Appx. 485 (9th Cir. 2008), the Ninth Circuit Court of Appeals addressed, in a similarly anomalous circumstance as the present case, the extent the filing of a lawsuit affects what evidence a district court may consider. In that case, the district court affirmed the insurer's denial of benefits. *Id.* at 486. However, in reviewing the insurer's findings, the district court admitted a doctor's report as part of the administrative record–a report that was presented several months after the time frame for the insurer to render a decision under the ERISA regulations had expired. The Ninth Circuit held that to consider such a report was error because once the plaintiff filed suit, the substantive relationship between the parties had changed to such an extent that the record was deemed closed upon the date the insurer was obligated to render a decision under the ERISA regulations. *Id.* at 487 ("In this case, the district court correctly ruled that [plaintiff] had exhausted her administrative remedies before filing suit, a ruling that [defendant] does not challenge. Because [plaintiff] exhausted her remedies and properly brought suit, the relationship of the parties had changed. [Defendant] submitted the [doctor's report] nearly three months after the administrative record closed. The district court therefore erred in admitting the [doctor's report] as part of the administrative record in its review of [defendant's] findings.") (citations omitted).

The Court believes *Neathery* affects the standard of review that is to apply in this case. On May 23, 2007, Steinke requested MetLife to make an any occupation determination. MetLife had 45 days, or until July 9, 2007, in which to render a decision. 29 C.F.R. § 2560-1(f)(3). MetLife did not issue a decision within this time frame, and Steinke filed suit on October 11, 2007. Hence, under *Neathery*, the act of filing the present lawsuit by Steinke so altered the relationship between the parties that administrative record closed on July 9, 2007. MetLife's March 17, 2008 decision relies heavily upon reports authored by Drs. Smith and Swain, as well as a vocational assessment conducted in February 2008. Because both doctors' reports and the vocational assessment were created after the administrative record

closed, it would be error for this Court to consider them. As such, because MetLife's March 17, 2008 decision relies upon such reports that were submitted after the record closed in this case, the Court cannot give any deference to the Plan administrator's decision. Accordingly, the Court will apply a de novo standard of review. The Court will next discuss the proper time frame from which it may consider evidence in the record for its de novo review.

**D.     Evidentiary Time Frame**

As previously discussed, the administrative record in this case closed on July 9, 2007. Hence, the Court is precluded from considered any evidence presented after this date. Moreover, Defendants have already paid Steinke on her any occupation disability claim through January 10, 2007. Thus, the Court need not consider any evidence prior to January 10, 2007, as such evidence bears on whether Steinke was disabled during this time period–an issue Defendants have resolved by paying Steinke's claim. Accordingly, the Court will consider evidence from January 11, 2007 through July 9, 2007.

**E.     Analysis**

The review of an ERISA benefit determination begins with the relevant Plan language. Here, benefits were paid through January 10, 2007. Entitlement to further benefits must be proven by Steinke under the any occupation definition of disability: "after the first 24 months of benefit payments, you must also be unable to perform each of the material duties of any gainful work or service for which you are reasonably qualified taking into consideration your training, education, experience and past earnings . . . ." (Doc. # 45-9 at p. 12.)

The only medical records during this time frame are from Dr. DeJesus, Steinke's own treating physician. This first is from a February 6, 2007 office visit:

> FOLLOW-UP VISIT: This is a 41 year old female seen today after her last visit 4 weeks ago. The patient states she is doing better with her migraines only having six in the last month, sometime proceeded by [not legible] which consists of little dots or black spots and sometimes has an [not legible] without headaches. She only had to take two Frova because some of her headaches could be controlled without medication only taking some rest and relax. She is still having the strange sensation around her mouth which could be exacerbated with touching the back of her head and it seems not to be as severe as before. Although she can feel it, the sensation is not as intense.

. . . .

      IMPRESSION AND PLAN: This is a 41-year old female with migraine headaches who is having good improvement with the frequency and intensity of her headaches. She started having an atypical facial pain or sensation around her mouth which is getting better, but still is present. There is no explanation at this moment for that symptom, for which it has been treated with Carbatrol because it could be related to a trigeminal neuralgic pain. I tried decreasing the Lyrica at last appointment, but the patient started having headaches more frequently. It was increased to 100 and now she is more stable for which it seems that Lyrica is helping for her headaches. I will try to taper her off of the Carbatrol or at least keep her on the minimal effective dosage. I suggested to decrease it to 100 mg twice a day and if she continues without exacerbation of the facial dyscsthesia, go off 100mg monthly. The patient will be kept on observation. Refills of medications such a Klonopin and nortriptlyin were given and will be seeing her again in six weeks.

(Doc. # 45, Ex. 5 at p. 42.) The next medical record is from a March 6, 2007 office note by Dr. DeJesus:

      FOLLOW-UP VISIT: This is a 41-year old female with a history of intractable migraines and atypical facial pain seen today after her last visit 1 month ago. The patient states she has continued doing well with her migraines. Last month she only had five migraines that were mostly around her menses. Most of them could be controlled with relaxation, although other required Frova. She started to feel the uncomfortable sensation around her mouth, probably because of Carbatrol that was decreased on the last appointment. She now can notice the difference of not having the medication. She is doing well with her depression and is on treatment with Melmda, still on Prozac 40 mg daily.

. . . .

      IMPRESSION: This is a 41-year old female with a previous history of intractable headaches which are having a great improvement and is actually having episodic migraines. She started having an uncomfortable dysesthesia around her mouth of uknown etiology which I started to treat with Carbatrol. It seems to be working really well and because she was almost asymptomatic, I tried to taper off and symptoms recurred. I will restart her on previous dosage of Carbatrol and even giving her 100 mg more to check if the symptom is completely under control.

(*Id.* at p. 41.) There are also headache charts from the time period in question. Although not entirely legible, the headache charts note the date of occurrence of the headache, the severity, what relief measures were taken, the duration, and what triggered the headache.

      The Court, having viewed the relevant medical evidence contained in the limited record, concludes that Steinke has failed to demonstrate that she is disabled within the any

- 13 -

occupation definition of the Plan. While Defendants found Steinke disabled for the time period leading up until January 10, 2007, after this time period, as marked by her own treating physician, Steinke was experiencing marked improvements. Dr. DeJesus repeatedly notes Steinke's advances, and even notes her headaches "are having a great improvement." Although Steinke complains of continued facial numbness, there is no indication in the medical records that such numbness precluded her from performing the material duties of any gainful work for which she qualifies. In any event, Dr. DeJesus notes that treating Steinke with Carbatrol worked "really well" and she became "almost asymptomatic." The Court also notes that in a May 23, 2007 letter, Steinke's legal counsel acknowledges that Steinke "and her physicians believe she may now be able to try and return to some type of employment." (*Id.* at p. 24.) Based upon the limited administrative record, the Court finds that Steinke has failed to demonstrate that she is disabled within the meaning of the any occupation definition contained in the Plan.

Accordingly,

**IT IS ORDERED** that, based upon the foregoing, the Clerk of the Court shall enter judgment for Defendant and against Plaintiff, with Plaintiff to take nothing.

DATED this 2nd day of August, 2010.

James A. Teilborg
United States District Judge